UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at FRANKFORT

CIVIL ACTION NO.  06-65-KKC

BELLSOUTH TELECOMMUNICATIONS, INC.,                              PLAINTIFF,

v.                              **OPINION AND ORDER**

KENTUCKY PUBLIC SERVICE COMMISSION, et al.,                    DEFENDANTS.

* * * * * * * * *

This matter is before the Court on Cross Motions for Summary Judgment [Rec. Nos. 32, 49, and 53] and a Motion to Dismiss Counterclaims filed by Plaintiff, BellSouth Telecommunications, Inc. ("BellSouth") [Rec. No. 35].

## I. BACKGROUND FACTS

In passing the 1996 Telecommunications Act ("the Act"), Congress sought to promote competition among telecommunications providers. *Verizon N. Inc. v. Strand*, 367 F.3d 577, 578 (6th Cir. 2004). The Act requires Incumbent Local Exchange Carriers ("ILECs"), which are companies like BellSouth that have traditionally provided local telephone service in a particular geographic area, to share their networks with Competitive Local Exchange Carriers ("CLECs"), which are entrants into the local telephone market such as Southeast Telephone, Inc. ("Southeast"). *Id.* ILECs are subject to a variety of duties, including the duty to "interconnect with and to rent parts of their networks to new entrants-especially those parts of a local network that it is least economic for a new entrant to duplicate." *Qwest Corp. v. Public Utilities Comm'n of Colo.*, 479 F.3d 1184, 1187 (10th Cir. 2007). The Federal Communications Commission ("FCC") is the agency charged with implementing the Act. Different sections of the Act impose

different obligations. Three sections are relevant in the current matter before the Court: § 251, §

252, and § 271.

## A. SECTION 251

Section 251 of the Act, 47 U.S.C. § 251 (2000), imposes several duties and obligations on

telecommunications carriers.  All carriers have the duty "to interconnect directly or indirectly

with the facilities and equipment of other telecommunications carriers," and to "not . . . install

network features, functions, or capabilities that do not comply with the guidelines and standards

established pursuant to section 255 or 256."  *Id.* § 251(a)[1].

These general duties are given specificity in subsections (b) and (c).  Subsection (b)

imposes several specific duties on all local exchange carriers, including duties not to prohibit, or

impose unreasonable constraints on, the resale of telecommunications services; to provide

number portability; to provide dialing parity; to afford access to the poles, ducts, conduits, and

rights-of-way of carriers; and to provide reciprocal compensation arrangements for

telecommunications.  *Id.* at (b)(1)-(5)[2].

---

[1] 47 U.S.C. § 251(a) reads as follows:

(a) General duty of telecommunications carriers. Each telecommunications carrier has the duty--
(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and
(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256.

[2] 47 U.S.C. § 251(b) reads as follows:

(b) Obligations of all local exchange carriers. Each local exchange carrier has the following duties:
(1) Resale. The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.
(2) Number portability. The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.
(3) Dialing parity. The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to

Subsection (c) imposes additional obligations on incumbent local exchange carriers. These include duties to negotiate in good faith the terms and conditions of agreements to fulfill the subsection (b) duties; to provide interconnection with the local exchange carrier's network for any requesting telecommunications carrier; to provide requesting telecommunications carriers with nondiscriminatory access to network elements on an unbundled basis; to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail; to provide reasonable public notice of information changes necessary for the transmission and routing of services; and to provide for physical collocation of equipment necessary for interconnection or access to unbundled network elements. *Id.* § 251(c)(1)-(6)[3]; *see also Verizon N., Inc.*, 367 F.3d

---

telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.
(4) Access to rights-of-way. The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224.
(5) Reciprocal compensation. The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

[3]  47 U.S.C. § 251(c) reads as follows:

(c) Additional obligations of incumbent local exchange carriers. In addition to the duties contained in subsection (b), each incumbent local exchange carrier has the following duties:
(1) Duty to negotiate. The duty to negotiate in good faith in accordance with section 252 the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.
(2) Interconnection. The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--
(A) for the transmission and routing of telephone exchange service and exchange access;
(B) at any technically feasible point within the carrier's network;
(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and
(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252.
(3) Unbundled access. The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252.  An incumbent local exchange carrier shall provide such unbundled network

3

at 582 (§ 251(c) specifically requires ILECs to share their networks with CLECs through three mechanisms: "1) permit competitors to purchase local services at wholesale rates for resale to end users, *see* 47 U.S.C. § 251(c)(4); 2) permit competitors to lease unbundled elements of the incumbent's network, *see id.* at § 251(c)(3); and 3) permit competitors to interconnect their facilities to the incumbent's network, *see id.* at § 251(c)(2).")

When an ILEC is required to lease a particular network element, that element is known as an unbundled network element ("UNE"). The Act defines "network element" as "a facility or equipment used in the provision of a telecommunications service." 47 U.S.C. § 153(29) (2000). Network elements include, among other elements, switches and transport cables. "Switches are equipment directing calls to their destination." *Qwest Corp.*, 479 F.3d at 1193. "Transport trunks are wires carrying calls between switches." *Id.* at 1194. The FCC determines which network elements are subject to unbundling. The FCC may require an ILEC to unbundle an element only if it determines that CLECs would be otherwise impaired in their ability to provide service. 47

---

elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

(4) Resale. The duty--

(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

(5) Notice of changes. The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

(6) Collocation. The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

4

U.S.C. § 251(d) (2000). Rates charged for unbundled elements are based on cost. Total Element

Long Run Incremental Cost ("TELRIC") is the methodology used to arrive at cost.

The set of pre-combined UNEs that provides all elements necessary to provide telephone

service is known as the UNE Platform. In February 2005, the FCC issued an order, the Triennial

Review Remand Order ("TRRO"), adopting a nationwide bar on the mandatory unbundling of

switching and thus the UNE Platform. [Rec. No. 53, Exhibit I]. The FCC created a twelve-month

transition period, ending on March 10, 2006, during which a CLEC's existing customers could

continue to use unbundled switching, and thus the UNE Platform. CLECs were required to pay a

higher rate for the UNE Platform, TELRIC plus $1. During this transition period, ILECs and

CLECs were to negotiate new interconnection agreements.

## B. SECTION 252

Section 252 of the Act, 47 U.S.C. § 252 (2000)[4], describes how § 251 duties are to be

---

[4] 47 U.S.C. § 252 reads as follows:

(a) Agreements arrived at through negotiation.
(1) Voluntary negotiations. Upon receiving a request for interconnection, services, or network elements pursuant to section 251, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], shall be submitted to the State commission under subsection (e) of this section.
(2) Mediation. Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

(b) Agreements arrived at through compulsory arbitration.
(1) Arbitration. During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.
(2) Duty of petitioner.
(A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning--
(i) the unresolved issues;

(ii) the position of each of the parties with respect to those issues; and

(iii) any other issue discussed and resolved by the parties.

(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

(3) Opportunity to respond. A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

(4) Action by State commission.

(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).

(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.

(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

(5) Refusal to negotiate. The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

(c) Standards for arbitration. In resolving by arbitration under subsection (b) any open issues and imposing conditions upon the parties to the agreement, a State commission shall--

(1) ensure that such resolution and conditions meet the requirements of section 251, including the regulations prescribed by the Commission pursuant to section 251;

(2) establish any rates for interconnection, services, or network elements according to subsection (d); and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

(d) Pricing standards.

(1) Interconnection and network element charges. Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section--

(A) shall be--

(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

(ii) nondiscriminatory, and

(B) may include a reasonable profit.

(2) Charges for transport and termination of traffic.

(A) In general. For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5), a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless--

(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the

6

additional costs of terminating such calls.

(B) Rules of construction. This paragraph shall not be construed--

(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or

(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

(3) Wholesale prices for telecommunications services. For the purposes of section 251(c)(4), a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.


(e) Approval by State commission.

(1) Approval required. Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

(2) Grounds for rejection. The State commission may only reject--

(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) if it finds that--

(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or

(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or

(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) if it finds that the agreement does not meet the requirements of section 251, including the regulations prescribed by the Commission pursuant to section 251, or the standards set forth in subsection (d) of this section.

(3) Preservation of authority. Notwithstanding paragraph (2), but subject to section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(4) Schedule for decision. If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a), or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b), the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

(5) Commission to act if State will not act. If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

(6) Review of State commission actions. In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.


(f) Statements of generally available terms.

(1) In general. A Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 and the regulations thereunder and the standards applicable under this section.

7

implemented. *Id.*; *see also Qwest Corp.*, 479 F.3d 1184. ILECs and CLECs negotiate binding

interconnection agreements once a request is received for interconnection, services, or network

elements under section 251.  47 U.S.C. § 252(a) (2000).  If such an agreement is reached, it is

submitted to the state commission for approval. *Id*. § 252(e).  If the ILEC and the CLEC cannot

---

(2) State commission review. A State commission may not approve such statement unless such statement complies with subsection (d) of this section and section 251 and the regulations thereunder. Except as provided in section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of such statement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(3) Schedule for review. The State commission to which a statement is submitted shall, not later than 60 days after the date of such submission--

(A) complete the review of such statement under paragraph (2) (including any reconsideration thereof), unless the submitting carrier agrees to an extension of the period for such review; or

(B) permit such statement to take effect.

(4) Authority to continue review. Paragraph (3) shall not preclude the State commission from continuing to review a statement that has been permitted to take effect under subparagraph (B) of such paragraph or from approving or disapproving such statement under paragraph (2).

(5) Duty to negotiate not affected. The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251.

(g) Consolidation of State proceedings. Where not inconsistent with the requirements of this Act, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this Act.

(h) Filing required. A State commission shall make a copy of each agreement approved under subsection (e) and each statement approved under subsection (f) available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

(i) Availability to other telecommunications carriers. A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the

agreement.

(j) Definition of incumbent local exchange carrier. For purposes of this section, the term "incumbent local exchange carrier" has the meaning provided in section 251(h).

reach an agreement, any party may request the state commission to arbitrate an agreement, or mediate differences that arise during negotiations. *Id.* § 252(a)(2), (b)(1), (b)(5).

The state commission may only reject the agreement for very limited reasons set forth in the Act. Specifically, if the agreement was adopted by negotiation pursuant to subsection (a), the commission may only reject the agreement if it discriminates against a telecommunications carrier not a party to the agreement, of if the agreement is not consistent with the public interest, convenience, or necessity.  *Id.* § 252(e)(2)(A).  If the agreement was adopted by arbitration, then it may only be rejected if it does not meet the requirements of section 251.  *Id.* § 252(e)(2)(B). In short, "[t]he Act provides detailed instructions and standards for the arbitration process and the establishment of rates, which the parties and the state commission must follow and implement during the compulsory arbitration process." *Verizon N., Inc.*, 367 F.3d at 582.

## C. SECTION 271

Section 271 of the Act, 47 U.S.C. § 271 (2000)[5], imposes different obligations than §§

_____

[5]  47 U.S.C. § 271 reads as follows:

(a) General limitation. Neither a Bell operating company, nor any affiliate of a Bell operating company, may provide interLATA services except as provided in this section.

(b) InterLATA services to which this section applies.
(1) In-region services. A Bell operating company, or any affiliate of that Bell operating company, may provide interLATA services originating in any of its in-region States (as defined in subsection (i)) if the Commission approves the application of such company for such State under subsection (d)(3).
(2) Out-of-region services. A Bell operating company, or any affiliate of that Bell operating company, may provide interLATA services originating outside its in-region States after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], subject to subsection (j).
(3) Incidental interLATA services. A Bell operating company, or any affiliate of a Bell operating company, may provide incidental interLATA services (as defined in subsection (g)) originating in any State after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996].
(4) Termination. Nothing in this section prohibits a Bell operating company or any of its affiliates from providing termination for interLATA services, subject to subsection (j).

(c) Requirements for providing certain in-region interLATA services.
(1) Agreement or statement. A Bell operating company meets the requirements of this paragraph if it meets

the requirements of subparagraph (A) or subparagraph (B) of this paragraph for each State for which the authorization is sought.

(A) Presence of a facilities-based competitor. A Bell operating company meets the requirements of this subparagraph if it has entered into one or more binding agreements that have been approved under section 252 specifying the terms and conditions under which the Bell operating company is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated competing providers of telephone exchange service (as defined in section 3(47)(A), but excluding exchange access) to residential and business subscribers. For the purpose of this subparagraph, such telephone exchange service may be offered by such competing providers either exclusively over their own telephone exchange service facilities or predominantly over their own telephone exchange service facilities in combination with the resale of the telecommunications services of another carrier. For the purpose of this subparagraph, services provided pursuant to subpart K of part 22 of the Commission's regulations shall not be considered to be telephone exchange services.

(B) Failure to request access. A Bell operating company meets the requirements of this subparagraph if, after 10 months after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], no such provider has requested the access and interconnection described in subparagraph (A) before the date which is 3 months before the date the company makes its application under subsection (d)(1), and a statement of the terms and conditions that the company generally offers to provide such access and interconnection has been approved or permitted to take effect by the State commission under section 252(f). For purposes of this subparagraph, a Bell operating company shall be considered not to have received any request for access and interconnection if the State commission of such State certifies that the only provider or providers making such a request have (i) failed to negotiate in good faith as required by section 252, or (ii) violated the terms of an agreement approved under section 252 by the provider's failure to comply, within a reasonable period of time, with the implementation schedule contained in such agreement.

(2) Specific interconnection requirements.

(A) Agreement required. A Bell operating company meets the requirements of this paragraph if, within the State for which the authorization is sought--

(i) (I) such company is providing access and interconnection pursuant to one or more agreements described in paragraph (1)(A), or

(II) such company is generally offering access and interconnection pursuant to a statement described in paragraph (1)(B), and

(ii) such access and interconnection meets the requirements of subparagraph (B) of this paragraph.

(B) Competitive checklist. Access or interconnection provided or generally offered by a Bell operating company to other telecommunications carriers meets the requirements of this subparagraph if such access and interconnection includes each of the following:

(i) Interconnection in accordance with the requirements of sections 251(c)(2) and 252(d)(1).

(ii) Nondiscriminatory access to network elements in accordance with the requirements of sections 251(c)(3) and 252(d)(1).

(iii) Nondiscriminatory access to the poles, ducts, conduits, and rights-of-way owned or controlled by the Bell operating company at just and reasonable rates in accordance with the requirements of section 224.

(iv) Local loop transmission from the central office to the customer's premises, unbundled from local switching or other services.

(v) Local transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services.

(vi) Local switching unbundled from transport, local loop transmission, or other services.

(vii) Nondiscriminatory access to--

(I) 911 and E911 services;

(II) directory assistance services to allow the other carrier's customers to obtain telephone numbers; and

(III) operator call completion services.

(viii) White pages directory listings for customers of the other carrier's telephone exchange service.

10

(ix) Until the date by which telecommunications numbering administration guidelines, plan, or rules are established, nondiscriminatory access to telephone numbers for assignment to the other carrier's telephone exchange service customers. After that date, compliance with such guidelines, plan, or rules.
(x) Nondiscriminatory access to databases and associated signaling necessary for call routing and completion.
(xi) Until the date by which the Commission issues regulations pursuant to section 251 to require number portability, interim telecommunications number portability through remote call forwarding, direct inward dialing trunks, or other comparable arrangements, with as little impairment of functioning, quality, reliability, and convenience as possible. After that date, full compliance with such regulations.
(xii) Nondiscriminatory access to such services or information as are necessary to allow the requesting carrier to implement local dialing parity in accordance with the requirements of section 251(b)(3).
(xiii) Reciprocal compensation arrangements in accordance with the requirements of section 252(d)(2).
(xiv) Telecommunications services are available for resale in accordance with the requirements of sections 251(c)(4) and 252(d)(3).

(d) Administrative provisions.
(1) Application to Commission. On and after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], a Bell operating company or its affiliate may apply to the Commission for authorization to provide interLATA services originating in any in-region State. The application shall identify each State for which the authorization is sought.
(2) Consultation.
(A) Consultation with the Attorney General. The Commission shall notify the Attorney General promptly of any application under paragraph (1). Before making any determination under this subsection, the Commission shall consult with the Attorney General, and if the Attorney General submits any comments in writing, such comments shall be included in the record of the Commission's decision. In consulting with and submitting comments to the Commission under this paragraph, the Attorney General shall provide to the Commission an evaluation of the application using any standard the Attorney General considers appropriate. The Commission shall give substantial weight to the Attorney General's evaluation, but such evaluation shall not have any preclusive effect on any Commission decision under paragraph (3).
(B) Consultation with State commissions. Before making any determination under this subsection, the Commission shall consult with the State commission of any State that is the subject of the application in order to verify the compliance of the Bell operating company with the requirements of subsection (c).
(3) Determination. Not later than 90 days after receiving an application under paragraph (1), the Commission shall issue a written determination approving or denying the authorization requested in the application for each State. The Commission shall not approve the authorization requested in an application submitted under paragraph (1) unless it finds that--
(A) the petitioning Bell operating company has met the requirements of subsection (c)(1) and--
(i) with respect to access and interconnection provided pursuant to subsection (c)(1)(A), has fully implemented the competitive checklist in subsection (c)(2)(B); or
(ii) with respect to access and interconnection generally offered pursuant to a statement under subsection (c)(1)(B), such statement offers all of the items included in the competitive checklist in subsection (c)(2)(B);
(B) the requested authorization will be carried out in accordance with the requirements of section 272; and
(C) the requested authorization is consistent with the public interest, convenience, and necessity.
The Commission shall state the basis for its approval or denial of the application.
(4) Limitation on commission. The Commission may not, by rule or otherwise, limit or extend the terms used in the competitive checklist set forth in subsection (c)(2)(B).
(5) Publication. Not later than 10 days after issuing a determination under paragraph (3), the Commission shall publish in the Federal Register a brief description of the determination.
(6) Enforcement of conditions.
(A) Commission authority. If at any time after the approval of an application under paragraph (3), the Commission determines that a Bell operating company has ceased to meet any of the conditions required for

11

such approval, the Commission may, after notice and opportunity for a hearing--
(i) issue an order to such company to correct the deficiency;
(ii) impose a penalty on such company pursuant to title V; or
(iii) suspend or revoke such approval.
(B) Receipt and review of complaints. The Commission shall establish procedures for the review of complaints concerning failures by Bell operating companies to meet conditions required for approval under paragraph (3). Unless the parties otherwise agree, the Commission shall act on such complaint within 90 days.

(e) Limitations.
(1) Joint marketing of local and long distance services. Until a Bell operating company is authorized pursuant to subsection (d) to provide interLATA services in an in-region State, or until 36 months have passed since the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], whichever is earlier, a telecommunications carrier that serves greater than 5 percent of the Nation's presubscribed access lines may not jointly market in such State telephone exchange service obtained from such company pursuant to section 251(c)(4) with interLATA services offered by that telecommunications carrier.
(2) IntraLATA toll dialing parity.
(A) Provision required. A Bell operating company granted authority to provide interLATA services under subsection (d) shall provide intraLATA toll dialing parity throughout that State coincident with its exercise of that authority.
(B) Limitation. Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity, a State may not require a Bell operating company to implement intraLATA toll dialing parity in that State before a Bell operating company has been granted authority under this section to provide interLATA services originating in that State or before 3 years after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], whichever is earlier. Nothing in this subparagraph precludes a State from issuing an order requiring intraLATA toll dialing parity in that State prior to either such date so long as such order does not take effect until after the earlier of either such dates.

(f) Exception for previously authorized activities. Neither subsection (a) nor section 273 shall prohibit a Bell operating company or affiliate from engaging, at any time after the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996], in any activity to the extent authorized by, and subject to the terms and conditions contained in, an order entered by the United States District Court for the District of Columbia pursuant to section VII or VIII(C) of the AT&T Consent Decree if such order was entered on or before such date of enactment, to the extent such order is not reversed or vacated on appeal. Nothing in this subsection shall be construed to limit, or to impose terms or conditions on, an activity in which a Bell operating company is otherwise authorized to engage under any other provision of this section.

(g) "Incidental interLATA services" defined. For purposes of this section, the term "incidental interLATA services" means the interLATA provision by a Bell operating company or its affiliate--
(1) (A) of audio programming, video programming, or other programming services to subscribers to such services of such company or affiliate;
(B) of the capability for interaction by such subscribers to select or respond to such audio programming, video programming, or other programming services;
(C) to distributors of audio programming or video programming that such company or affiliate owns or controls, or is licensed by the copyright owner of such programming (or by an assignee of such owner) to distribute; or
(D) of alarm monitoring services;
(2) of two-way interactive video services or Internet services over dedicated facilities to or for elementary and secondary schools as defined in section 254(h)(5);
(3) of commercial mobile services in accordance with section 332(c) of this Act and with the regulations

12

251 and 252. Sections 251 and 252 apply to all ILECs, while § 271 applies only to Bell

Operating Companies ("BOCs"), which are former subsidiaries of AT&T.  *Id.* § 271(a); *see also*

*Qwest Corp.*, 479 F.3d 1184. The Plaintiff, BellSouth, is a BOC.

　　BOCs had previously been prohibited from offering long-distance telephone service.

However, § 271 permits BOCs to offer such service if they can "demonstrate that they have

opened their local exchanges to competition." *Verizon N., Inc. v. Strand*, 309 F.3d 935, 942 (6th

Cir. 2002).  A BOC may provide long-distance service originating in any of its in-region states if

---

prescribed by the Commission pursuant to paragraph (8) of such section;
(4) of a service that permits a customer that is located in one LATA to retrieve stored information from, or file information for storage in, information storage facilities of such company that are located in another LATA;
(5) of signaling information used in connection with the provision of telephone exchange services or exchange access by a local exchange carrier; or
(6) of network control signaling information to, and receipt of such signaling information from, common carriers offering interLATA services at any location within the area in which such Bell operating company provides telephone exchange services or exchange access.

(h) Limitations. The provisions of subsection (g) are intended to be narrowly construed. The interLATA services provided under subparagraph (A), (B), or (C) of subsection (g)(1) are limited to those interLATA transmissions incidental to the provision by a Bell operating company or its affiliate of video, audio, and other programming services that the company or its affiliate is engaged in providing to the public. The Commission shall ensure that the provision of services authorized under subsection (g) by a Bell operating company or its affiliate will not adversely affect telephone exchange service ratepayers or competition in any telecommunications market.

(i) Additional definitions. As used in this section--
(1) In-region State. The term "in-region State" means a State in which a Bell operating company or any of its affiliates was authorized to provide wireline telephone exchange service pursuant to the reorganization plan approved under the AT&T Consent Decree, as in effect on the day before the date of enactment of the Telecommunications Act of 1996 [enacted Feb. 8, 1996].
(2) Audio programming services. The term "audio programming services" means programming provided by, or generally considered to be comparable to programming provided by, a radio broadcast station.
(3) Video programming services; other programming services. The terms "video programming service" and "other programming services" have the same meanings as such terms have under section 602 of this Act.

(j) Certain service applications treated as in-region service applications. For purposes of this section, a Bell operating company application to provide 800 service, private line service, or their equivalents that--
(1) terminate in an in-region State of that Bell operating company, and
(2) allow the called party to determine the interLATA carrier, shall be considered an in-region service subject to the requirements of subsection (b)(1).

it receives Commission approval pursuant to § 271(d)(3).  47 U.S.C. § 271(b)(1) (2000).  The

Commission is to approve the BOC's application to provide long-distance service if it meets the

requirements of subsection (c)(1) for each state for which the authorization is sought.  *Id.* §§

271(d)(3), (c)(1).  Subsection (c)'s requirements are satisfied if the BOC has entered into a

binding interconnection agreement pursuant to § 252, or if no CLEC has requested access and

interconnection with the BOC. *Id*. § 271(c)(1)(A)-(B); *see also Verizon N., Inc.*, 309 F.3d at 942.

If a BOP is "operating in a competitive market and wishes to qualify under § 271(c)(1)(A), it

must meet the requirements of § 251 as well as the additional requirements of the 'competitive

checklist' in § 271(c)(2)(B)." *Qwest Corp.*, 479 F.3d at 1189.

The FCC either approves or denies a BOC's application to provide long-distance service

pursuant to § 271. 47 U.S.C. § 271(d)(3) (2000).  In making this determination, the FCC consults

with the state commission of any state that is the subject of the long-distance service application

to verify a BOC's compliance with § 271 requirements. *Id.* § 271(d)(2)(B).

In September 2002, after consulting with the state commission, the Kentucky Public

Service Commission ("PSC"),  the FCC approved BellSouth's § 271 application to provide long-

distance service in Kentucky.

## D. PROCEDURAL HISTORY

On February 11, 2005, apparently in response to the FCC's TRRO, BellSouth notified all

CLECs, including Defendant Southeast, that, as of March 11, 2005, it would no longer accept

new UNE switching orders. On March 10, 2005, the Defendant, PSC, issued two orders

mandating that BellSouth continue to provide new UNE Platform orders for an indefinite period.

On March 17, 2005, BellSouth filed a complaint seeking declaratory and injunctive relief from

14

PSC's orders in U.S. District Court. The court granted BellSouth relief and issued a permanent injunction against enforcement of the PSC orders. *See BellSouth Telecomms., Inc. v. Cinergy Commc'ns Co.*, 2006 WL 695424 (E.D. Ky. 2006).[6]

Following the decision in the *Cinergy* case, BellSouth notified all CLECs, including Southeast, that effective April 27, 2005, BellSouth would no longer accept new service requests for the UNE Platform. Nonetheless, BellSouth asserts that Southeast continued to attempt to place new UNE Platform orders, which BellSouth rejected. BellSouth alleges that when Southeast could no longer order the UNE Platform, it started placing orders under the separate resale provisions of its interconnection agreement with BellSouth, which allows Southeast to obtain all facilities necessary to provide local service but at higher rates than those that apply to UNEs. Southeast refused to pay the resale rates and instead paid the TELRIC rates for UNE Platform orders.

On November 2, 2005, BellSouth sent notice of its intent to suspend or terminate services if Southeast did not pay for the services it ordered as resale. On December 6, 2005, BellSouth sent a letter to the PSC stating its intention to disconnect Southeast for non-payment. On December 13, 2005, Southeast filed a complaint and request for an emergency injunction against BellSouth with the PSC. On December 16, 2005, the PSC issued an order finding that there was

---

[6]The Court, in granting a permanent injunction against enforcement of the PSC orders, held that the PSC orders mandating that BellSouth continue to provide switching, loops, and transport services for new orders to CLECs were pre-empted because they were inconsistent with the FCC's Order on Remand. However, the Court stated specifically that it was "not making a finding as to whether BellSouth has additional unbundling requirements pursuant to § 271." The Court explained that, "[i]n the Court's Opinion granting preliminary relief, the Court noted that this Court was not the appropriate forum to address this issue because the FCC was the appropriate forum. This statement was dictum and was only addressed because the Defendants argued that § 271 prevented the Court's entry of a preliminary injunction. As the Court is merely concluding that the PSC orders are pre-empted by the Order on Remand, the Court makes no finding as to § 271 requirements."

a dispute of law between the parties and ordered BellSouth to consider Southeast's account

current while the dispute was pending.

On August 16, 2006, the PSC issued the order that is now on appeal ("PSC Order"). The

Order held that while the FCC's TRRO eliminated the requirement that BellSouth provide

switching pursuant to § 251 (thus also eliminating the UNE Platform), BellSouth must still

provide switching and transport elements to Southeast pursuant to § 271. The Order further held

that § 271 elements constitute wholesale service that must be made available on a commingled

basis with § 251 UNEs. In the Order, the PSC determined that the appropriate rate for services

ordered by Southeast was TELRIC plus $1 until the parties could agree on a new rate. [Rec. No.

47, Official Records, Corrected Exhibit E-2, pgs. 26-38].

## II. STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The moving party bears the initial responsibility of "informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence

supporting one or more essential elements of the non-movant's claim.  *Id.* at 322-25.  Once the

movant meets this burden, the opposing party "must set forth specific facts showing that there is

16

a genuine issue for trial." FED. R. CIV. P. 56(e).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

In considering a motion for summary judgment, the court must view the facts and draw all inferences therefrom in a light most favorable to the nonmoving party.  *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).  The moving party must show conclusively that there is no genuine issue of material fact. *Id.*

In considering a  motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint should not be dismissed . . . unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (citation omitted). "The reviewing court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true and determine whether the plaintiff can prove no set of facts in support of his claims that would entitle him to

relief." *Arrow v. Fed. Reserve Bank of St. Louis*, 358 F.3d 392, 393 (6th Cir. 2004).

## III. ANALYSIS

## A. CROSS MOTIONS FOR SUMMARY JUDGMENT

BellSouth argues that PSC exceeded its statutory authority when it issued the August 16, 2006 Order. In the Order, the PSC acknowledged that BellSouth was no longer obligated to provide switching and thus the UNE Platform pursuant to § 251 due to the FCC's TRRO. [Rec. No. 47, Official Records, Corrected Exhibit E-2, pgs. 35-38]. However, the PSC held that BellSouth "must provide access to switching and transport elements for Southeast pursuant to § 271." *Id*. at 36. The PSC went on to establish the appropriate price of the switching and transport elements as TELRIC plus $1. *Id*. at 37. BellSouth argues that the 1996 Act does not give the PSC authority to implement § 271, thus, the PSC Order is invalid.

Sections 251, 252, and 271 differ with respect to the role of state commissions. Section 252 provides that ILECs and CLECs are to negotiate interconnection agreements regarding § 251 elements. 47 U.S.C. § 252(a) (2000). The interconnection agreements must be submitted to the state commission. The state commission must then approve or reject the agreement based on certain guidelines. *Id.* § 252(e). If the parties are unable to reach an agreement, the state commission must arbitrate any open issues. *Id.* § 252(b). The Act establishes the standards for arbitration and specifically instructs the state commission to "establish any rates for interconnection, services, or network elements." *Id.* § 252(c). Furthermore, the Act establishes pricing standards on which the state commission should rely in establishing the rates for § 251 elements. *Id.* § 252(d).

Section 271 contemplates a different role for state commissions. The FCC is the agency

18

charged with approving or denying an application pursuant to § 271. The FCC is required to

consult with state commissions to verify that a particular BOC has complied with the

requirements set forth under § 271. *Id.* § 271(d)(2)(B). However, the ultimate decision regarding

an application pursuant to § 271 is made solely by the FCC. *Id.* § 271(d)(3). The Act does not

provide any provisions in § 271 regarding arbitration or pricing by the state commission. In

contrast, § 252 specifically instructs the state commission to "establish any rates for

interconnection, services, or network elements" and establishes pricing standards for setting the

rates. *Id.* § 252(c).

Once a BOC receives authorization to provide long-distance services, "the statute places

exclusive enforcement of any ongoing obligations with the FCC." *Sw. Bell Tel., L.P. v. Mo.

Public Serv. Comm'n*, 461 F. Supp. 2d 1055, 1067 (E.D. Mo. 2006).  "After a BOC obtains

authorization, it must continue to comply with the conditions. A person, including a competitor,

who asserts that a BOC has failed to comply with the conditions may file a complaint with the

FCC. *See* 47 U.S.C. § 271(d)(6)(B). The FCC must act on such a complaint within 90 days

(unless the parties agree otherwise)." *Dieca Commn'cs, Inc. v. Fla. Public Serv. Comm'n*, 447 F.

Supp. 2d 1281, 1286 (N.D. Fla. 2006); *see also* 47 U.S.C. § 271(d)(6)(B).

Several other district courts have addressed the issue of whether a state commission has

the authority to act pursuant to § 271. *See Qwest Corp. v. Ariz. Corp. Comm'n*., 2007 WL

2068103 (D. Ariz.,2007) (noting the different roles of the state commission with regard to § 251

and § 271. Under § 271, the state commission is only an advisor to the FCC. Furthermore, §

271(d)(6)(B) provides the sole method of enforcing § 271); *Sw. Bell Tel., L.P.*, 461 F. Supp. 2d at

1071 (The state commission lacks authority to include § 271 elements as part of an arbitrated

interconnection agreement or set rates for these items); *Ill. Bell Tel. Co. v. O'Connell-Diaz,* 2006 WL 2796488, at *13 (N.D. Ill. 2006) (unpublished) ("The structure of the Act strongly suggests Congress's intent to separate Sections 251 and 252 from Section 271, as well its intent to confine state authority to the former provisions. The ICC argues that its regulations are not an attempt to enforce Section 271's requirements. Nevertheless, the ICC purports to rely on Section 271, and in so doing, is attempting to accomplish through indirect means what it is clearly prevented from doing directly"); *Dieca Commn'cs, Inc.*, 447 F. Supp. 2d at 1286 (The FCC must consult with the state commission before making the determination regarding § 271 but otherwise the state commission has no role. Violations of § 271 are issues for the FCC, not state commissions); *Verizon New England, Inc. v. N.H. Public Utils. Comm'n*, 2006 WL 2433249 (D.N.H. 2006) (unpublished) (The UNEs were required under § 271 rather than § 251, thus, the state commission did not have authority). *But see Verizon New England, Inc. v. Me. Public Utils. Comm'n*, 403 F. Supp. 2d 96 (D. Me. 2005) ("The authority of state commissions over rate-making and its applicable standards is not pre-empted by the express or implied content of § 271.").

The PSC claimed to act pursuant to § 271 in its Order.  However, it simply cannot point to any provision in § 271 granting it authority to enforce § 271 and set rates for those elements. The plain language of the statute does not grant the PSC authority to act pursuant to § 271. Furthermore, considering the explicit authority granted to state commissions under §§ 251 and 252, Congress could have easily included the same provisions in § 271, but did not. Instead, Congress granted sole enforcement authority to the FCC and only gave state commissions an advisory role.

20

The PSC points to the FCC Order that approved BellSouth's § 271 application to provide long-distance service in Kentucky as support for the proposition that the PSC has a concurrent role under § 271. [*See* Rec. No. 48, Exhibit A]. However, the language contained in the Order does not grant the PSC authority to enforce § 271 or set rates. See *Verizon New England, Inc.*, 2006 WL 2433249, at *7 n.28 ("[T]he FCC's order does not delegate any oversight authority to the PUC, nor does it alter the PUC's limited consultative role under § 271 . . . .").

Finally, the PSC cannot claim that it was simply enforcing the interconnection agreement between BellSouth and Southeast.  In *Qwest Corp. v. Public Utilities Commission of Colorado*, the Tenth Circuit explained that the arbitration power of state commissions cannot extend beyond § 251 elements. 479 F.3d 1184. Thus, the PSC had no authority to arbitrate rates for § 271 elements.

Since the PSC had no authority to act pursuant to § 271, the PSC's Order is hereby declared unlawful and enjoined from enforcement. BellSouth's Motion for Summary Judgment is granted, and PSC and Southeast's Cross Motions for Summary Judgment are denied.  BellSouth also requests the Court to order Southeast to pay BellSouth the resale rates for those services that Southeast ordered. Having determined that the PSC lacks authority under § 271, the Court will not address the issue of damages. However, the Court acknowledges that it has the power to remand the action to the PSC to determine what, if any, damages are due as a result of the unlawful orders. *BellSouth Telecomms., Inc. v. Ga. Public Serv. Comm'n*, 400 F.3d 1268, 1271 (11th Cir. 2005); *see also BellSouth Telecomms., Inc. v. Cinergy Commc'ns Co.*, 2006 WL 695424 (E.D. Ky. 2006). Therefore, the Court will remand the matter to the PSC to determine the amount of damages, if any, owed to BellSouth.

21

**B. BELLSOUTH'S MOTION TO DISMISS COUNTERCLAIMS**

On September 12, 2006, BellSouth filed a complaint for declaratory and injunctive relief asserting that PSC's August 16th Order is unlawful. On October 16, 2006, Southeast filed seven counterclaims. BellSouth argues that the counterclaims should be dismissed for either lack of subject matter jurisdiction or failure to state a claim on which relief can be granted.

**1. COUNTERCLAIM ONE**

Counterclaim One alleges that BellSouth violated §§ 271 and 252 of the Act by refusing to negotiate in good faith over a binding agreement regarding access to § 271 elements. [Rec. No. 26, Counterclaims, pg. 23]. Southeast alleges that BellSouth violated its "independent obligation" under §§ 201, 202, and 271 to provide access to certain elements at just, reasonable, and nondiscriminatory rates. Furthermore, refusal to offer § 271 elements on a commingled basis with § 251 elements violates §§ 201, 202, 251, 252, and 271.

BellSouth argues that Counterclaim One should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction because issues such as these must be brought first with the PSC and because there is no private right of action to enforce § 271.

Regardless of the specific statute cited, all of Southeast's claims appear to be based on violations of § 271. Southeast relies on 47 U.S.C. § 207 as support for the proposition that a private cause of action exists for violations of § 271. Section 207 provides:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

22

As discussed above, once a BOC receives authorization to provide long-distance services, the enforcement of § 271 lies solely with the FCC. *Sw. Bell Tel., L.P.*, 461 F. Supp. 2d at 1067. Any person or entity who asserts that a BOC has failed to comply with § 271 may file a complaint with the FCC and the FCC must act on that complaint within ninety days. 47 U.S.C. § 271(d)(6)(B) (2000). Thus, the Act provides specific instructions on how to address violations of § 271. The Court will not disturb the Act's specific mandate by entertaining a claim based on violations of § 271. Section 207 cannot be used to bypass the specific procedure prescribed in § 271. *See also Qwest Corp. v. Utah Telecomms. Open Infrastructure Agency*, 438 F. Supp. 2d 1321 (D. Utah 2006) (Section 251 does not create a private right of action. "Most courts to address the issue have also held that § 207 does not create a private right of action for violations of the Telecommunications Act of 1996. In short, the great weight of authority demonstrates that there is no private right of action for violations of the 1996 Act").

Southeast argues that a recent Supreme Court decision supports its argument that a private cause of action exists in this case. In *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 127 S. Ct. 1513 (2007), the Supreme Court determined that a pay-phone-service provider could bring a private right of action against a long-distance provider pursuant to § 201 and § 207. The long-distance carrier had failed to pay certain fees to the pay-phone provider. The court held that if the FCC could determine that the failure to pay the fees constitutes an unreasonable practice under § 201 then the lawsuit could be maintained. The FCC had previously determined that failure to pay fees was an unreasonable practice, thus, a private cause of action existed. *Id*. This case is easily distinguished from the present matter because Southeast has failed to point to any decision by the FCC declaring the particular practices at issue

23

here unreasonable under § 201.

To the extent that Southeast claims independent violations of §§ 201 and 202 by claiming the BellSouth engaged in unreasonable practices, the Sixth Circuit has held that "claims based on section 201(b) of the Communications Act are within the primary jurisdiction of the FCC." *In re Long Distance Telecomms. Litig.*, 831 F.2d 627, 631 (6th Cir. 1987). The determination of whether BellSouth engaged in unreasonable practices "is a determination that Congress has placed squarely in the hands of the [FCC]." *Id. (*quoting *Consolidated Rail Corp. v. Nat'l Ass'n of Recycling Indus., Inc*., 449 U.S. 609 (1981)). Accordingly, the Court will not consider the merits of this counterclaim until the FCC has had an opportunity to consider it *Id*. at 632.  Therefore, any issues pertaining to independent violations of §§ 201 and 202 will be stayed pending resolution by the FCC. Southeast will be given thirty days from entry of this Order to file a status report advising the Court of its intentions regarding this Counterclaim.

## 2. COUNTERCLAIM TWO

In Counterclaim Two, Southeast alleges that BellSouth violated the Kentucky Public Utility Statute by failing to furnish reasonable service and establish rules governing its conduct in violation of Kentucky Revised Statute ("KRS") 278.030(2); failing to provide reasonable classifications for its service, patrons, and rates in violation of KRS 278.030(3); engaging in discriminatory utilities practices in violation of KRS 278.260; and refusing to interconnect its lines in violation of KRS 278.530(1). [Rec. No. 26, pg. 26].

BellSouth argues that Counterclaim Two must be dismissed for lack of jurisdiction and/or failure to state a claim because Southeast has already litigated these issues before the PSC and received relief, and to the extent Southeast alleges new violations, those claims must first be

24

brought before the PSC.

To the extent that Southeast is claiming new violations of the Public Utilities Statute, the Court agrees with BellSouth: those claims must first be brought before the PSC. *See* KY. REV. STAT. ANN. § 278.040(2) (2006) ("The commission shall have exclusive jurisdiction over the regulation of rates and service of utilities"); *Smith v. S. Bell Tel. & Tel. Co.*, 104 S.W.2d 961, 963 (Ky. 1937) ("the primary jurisdiction and authority to fix rates, establish reasonable regulation of service, and to alter and make changes to said regulations and to make investigation as to any change in service . . . is exclusively and primarily in the commission").

Southeast argues that these particular claims have already been brought before the PSC and that "the point of Counterclaim 2 is to compel BellSouth to submit to the authority of the PSC and cooperate with the ongoing arbitration proceedings" and "to impose monetary sanctions for BellSouth's violations of the state statutory violations already considered by the PSC." [Rec. No. 54, pg. 27]. The Court has already determined that the PSC did not have jurisdiction pursuant to § 271 to act, thus, to the extent that Southeast is requesting the Court to order BellSouth to submit to a process that it has determined illegal, the Court declines to do so. Thus, Counterclaim Two is dismissed.

### 3. COUNTERCLAIMS THREE THROUGH SEVEN

Counterclaims Three, Four, and Five allege violations of federal antitrust law, namely, the Sherman Act, and Counterclaims Six and Seven allege violations of Kentucky commercial law. Southeast asserts Counterclaims Three through Seven as alternative claims in the event Counterclaims One and Two fail. These Counterclaims are expressly premised upon the assumption that BellSouth is subject to "no regulatory constraints." [Rec. No. 54, Response, pg.

28]. Because BellSouth is subject to regulation, the remaining Counterclaims fail.

BellSouth, as an ILEC, is subject to a host of duties in §§ 251 and 252. These duties are discussed above and conclusively demonstrate that BellSouth is subject to regulations under the 1996 Act. Furthermore, as a BOC, BellSouth is subject to § 271 duties. The Court, by holding that the PSC Orders are unlawful, in no way suggests that BellSouth is not subject to § 271 duties. Instead, the Court merely concludes that the PSC did not have the authority to act pursuant to § 271. Furthermore, the 1996 Act includes a specific provision to address violations of § 271.  *See* 47 U.S.C. § 271(d)(6)(B) (2000). Because Southeast's remaining Counterclaims are specifically premised upon the assumption that BellSouth is not subject to any regulation, the claims fail.

In any event, Counterclaims Three through Five do not sufficiently state federal antitrust claims. In *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP., 540 U.S. 398 (2004), the Supreme Court held that a complaint alleging breach of an ILEC's duty to share its network with competitors in violation of the 1996 Act did not state a monopolization claim under the Sherman Act. The court acknowledged that the 1996 Act is "a regulatory structure designed to deter and remedy anticompetitive harm." *Id*. at 412. "Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Id*.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** as follows:

(1)      BellSouth's Motion for Summary Judgment [Rec. No. 32] is **GRANTED**;

(2)      this matter is remanded to the PSC to determine the amount of damages, if any,

owed as result of the unlawful order;

(3)     PSC's Cross Motion for Summary Judgment [Rec. No. 49] is **DENIED**;

(4)     Southeast's Cross Motion for Summary Judgment [Rec. No. 53] is **DENIED**;

(5)     BellSouth's Motion to Dismiss Counterclaims is **GRANTED** in part and

        **DENIED** in part. Southeast's Counterclaim alleging independent violations of §§

        201 and 202 is **STAYED** pending resolution by the FCC. Within thirty days of

        entry of this Order, Southeast shall file a status report advising the Court of its

        intentions regarding this particular Counterclaim. All remaining counterclaims are

        **DISMISSED**.

This the 18th day of September, 2007.

**Signed By:**

***Karen K. Caldwell***

**United States District Judge**

27